May it please the Court, my name is Fred Alvarez. This is my co-counsel Michael Nader. We represent Go Daddy, the appellants, in this matter. A retaliation claim has a certain logic to it, a sequential logic that requires that protected activity occur before an adverse employment decision. The protected activity is the horse that drags the cart of an adverse decision that's based on the protected activity. The fundamental problem with the verdict in this case is that the evidence from both sides was that the decision that was at issue in the case, or the decision that would support the verdict, was made before the protected activity. Now, the decision, you mean the adverse employment action? I actually mean the decision. Well, you see, that's what I think may be part of the problem. I mean, your claim made a number of decisions adverse to the plaintiff here. Some of them took place before the allegedly protected conduct, and according to them, some took place afterwards. So when you say the decision, I'm not sure what you're talking about. So the decision that the EEOC identifies as the retaliatory action here was the failure to return Mr. Bouamama to the sales representative position on the sales floor. But they abolished that position. No, no. There are three positions here at issue. One is the position that he had, the inbound sales position. That position was eliminated, and there's no controversy over that. Then there's the sales supervisor position, which is the one he was told that he could apply to. And then the last position is the old sales floor job that he used to have. He testified unmistakably that he was told on April the 4th, which is the day he was told about his job being eliminated, the previous job, he was told that he could, according to him, that he could apply for the supervisor job or he could walk away. And he said that was repeated five times. He was asked what walk away means, and he said, I'd lose my – essentially, I'd lose my job. So our point is that – Franklin comes by and says a good thing, I like you. That's the interesting issue here, Your Honor. Our view is he was fired when he was told that he could either get the supervisory job or walk away. The jury doesn't seem to have agreed with you on that point. Pardon? The jury does not seem to have agreed with you on that point. Well, our concern, Your Honor, is that they have no evidence to find that any decision was ever made different than what was made on April the 4th. Did he come into the workplace after Mr. Franklin said a good thing, I like you? Yes, he did. And was he told after Mr. Franklin said, I like you, you're canned? No, he was told that – if you believe him, he was told that before. Was he also told it afterwards? I mean, what happened after he comes back? Why does he finally leave? I mean, obviously something goes on that leads him to think that, you know, I really am fired. But that's what he was told on April the 4th. But then what happened? He shows up for work the next day. Why does he hang around? Well, because his position – because the termination wasn't effective until later. The point I'm trying to make, Your Honor, is that the Breeden Supreme Court case makes very clear that if a decision is made and then there's some intervening protected activity, it's not – and then the termination gets implemented. It's not evidence of causation that there was an intervening protected activity if a decision was already made and communicated. And no matter which side of the evidence the jury believed, on April the 4th, if you believe Go Daddy, on April the 4th he was said, you can either apply for this supervisory position or you can go back to the floor. The jury apparently didn't believe that. If they believed Mr. Buamama, he said, I was told that I could either apply for this position or walk away. He testified to that at least twice. He clarified another time that he was never offered the opportunity to stay on the floor. And so, therefore, it's clear that the decision would have been made before this protected activity. And I think that's the subtle but very important error that was made below. It's the timing of the decision, not the timing of the implementation of the action. And the Breeden Court makes that very clear. And if you look at the EEOC's brief, they also make clear that the discrimination, if there was any, was that he couldn't stay on the sales floor. But they made clear that he was told that on April the 4th before any alleged protected activity on April the 7th. Let me just say a word about the protected activity. Well, before you get there, there's a waiver argument, right? There is a waiver argument, Your Honor, and So you're going to wait for rebuttal? No, I'll be happy to address that. There's a waiver argument essentially on two issues. One is whether there was enough protected activity here to trigger the retaliation analysis. And that, in our view, is a question of law. And there is good case law, and it's cited on page 28 or 29 of our reply brief. Why don't we talk about the other waiver argument? The waiver on the causation. Well, our the point we would make with respect to that, Your Honor, is that while the motion itself was reasonably narrow, the Court, even the Court interpreted to be a motion that went after the causation. The Court says in footnote 1 of its decision, defendant did argue that the plaintiff failed to prove a connection between the protected activity and Mr. Oh, I see. Yeah, go ahead. Footnote 1 of it. I got it. I got it. Go ahead. So the Court sees it as a motion that goes to the causation issue. And so our point is that in Ninth Circuit law and in other circuits, when you address the waiver issue, you look at whether or not there was an opportunity for the other side to present deficiencies in the evidence. And here, the Court saw it as a motion on the causation. And so the arguments that are made about causation, it seems to me, to be within that ambit. Indeed, there was a debate about jury instructions, and those instructions had to do with causation. And there's Ninth Circuit law, the McLaren case, that says if the issue is raised in jury instructions, that's enough to put people on notice. But maybe the more fundamental answer, Your Honor, to the waiver issue is, what other evidence would there have been? Below, they fully litigated causation. They fully litigated protected activity. All those issues were well known to the parties. So it seems like we're honoring form over substance to say, well, the Rule 50A motion, which was a brief oral motion, waives any claim over fundamental issues like causation, like protected activity. So that's our view on the waiver. Our view is, the waiver wasn't there, but even if it was, Your Honor, our point is that given the fact that there's no evidence that a different decision was made after April the 4th, that there is no evidence to support the ultimate verdict that he lost his job because of protected activity, because he lost his job, according to him, on April the 4th if he didn't get the supervisory position. Let me make one point about the protected activity issue, if I could. This is the Breeden circumstance. If you look at the Breeden decision, the kind of conduct that the Supreme Court determined there to be insufficient to raise the retaliation analysis is certainly of the same quality, if not more, than what happened here. Remember, what happened here were a series of questions. Where is this picture from? Are you from Morocco? Are you Muslim? You're lucky that I like you. When you compare that conduct. Now, that's two different conversations here. No, I think it's one conversation, Your Honor. Okay, so it was an earlier conversation of where you're from from somebody else. That was about a year earlier, or ten months earlier. So you're only talking about the Franklin conversation. That's right. In fact, the trial court said that was the, complaining about that conversation was the only protected activity at issue in the case. The court said that three times. My point is that that single conversation, the supervisor walking up and saying, where's that picture from? It's from Morocco, or are you from Morocco? Yes, I am. Are you Muslim? Yes, I am. You're lucky I like you. That kind of conduct doesn't meet the, meet the standard of what's required under the Breeden case to be sufficient to raise the retaliation protection. Complaining about that conversation is not a complaint about conduct that violates title seven. And if, if the court reviews the Breeden case. But do you need to have an order for a good val, good val, excuse me. Do you need for a good retaliation claim to show first off that the, that your complaint was entirely well founded? No. No, Your Honor. We're not taking that position. Not that it's well founded. But that a reasonable person would believe that title seven would be violated. And title seven requires a severe and pervasive atmosphere of discrimination. Well, now we're talking two different things. One, what does title seven require? Yes. And the other one is, what is a protected complaint about behavior that might or might not violate title seven? That's correct. And here all we need to show is a complaint that is actionable if there's retaliation afterwards. You're not required to show that Mr. Franklin's conduct merely is saying, where are you from? Good thing I like you, violates title seven, is he? No, the court is correct. He's not required to show that that's, that's actually a violation. What he's required to show under the Breeden case is whether a reasonable person would believe that that conduct violates the standards of title seven. And so, if you look at the, a case like Breeden, where there's also a single isolated comment, or you look at the D.C., D.C. Circuit case of George versus Levitt, where Judge Edwards said that asking somebody from Trinidad and Tobago three times, why don't you go back where you came from? Or there's even worse conduct in the Jordan versus alternative resources case in the Fourth Circuit, though even those complaints about those comments seem to me much worse than asking where this picture's from. Are you from Morocco? Are you Muslim? You're lucky I like you. So the point is that the threshold associated with the retaliation case wasn't met when you look at the standards laid out in the Breeden case. So with that, Your Honor, if I, no more questions, I'll reserve the balance of my time. Good morning, Your Honors. I'm Jim Tucker for the EEOC. The primary problem with Godaddy's arguments on appeal was encapsulated by the argument we just heard. We heard often our view, Godaddy's position. The bottom line is whether or not a reasonable jury could have concluded in favor of the commission on the evidence in front of it. And as we stated in our brief, I believe that we did so. We did present sufficient evidence to support our claim on every element. Going to the issue of, just real briefly, address a couple factual statements that were made. Godaddy's counsel just stated that it's clear that Mr. Bumama was terminated on April 4th. That's absolutely not the case. Mr. Bumama explicitly testified that he was terminated on the 17th, the day when Ms. Slezak and Mr. Franklin met with him the last day he was there and told him he was not entitled, he didn't get the sales supervisor job, and he's not going to stay in the sales floor. You're terminated effective immediately. That's approximately two weeks after he engaged in protected activity. As far as the question of Breeden's application in this case. And what is it that he testified to that happened before he complained about Mr. Franklin's activity that they're relying on? That's right. Let me first give you the operative facts in the background and then his actual complaint. The facts that he complained of were that he's on one day, let's say three, I believe it's two or three days before he makes his actual complaint to Ms. Slezak. He meets with three Godaddy management officials, Slezak, Franklin, and his job is being eliminated, and that he can stay on as a, he can apply for the sales supervisor job, or he can leave. Villeneuve testified at trial, and this was Godaddy's theory of the case at trial, that every employee was entitled to stay on as sales representative if they didn't get the sales supervisor job. So whether or not they mentioned it to Mr. Blumaum is immaterial. They testified to that point, and that was the theory of the case below. At that meeting, I'm sorry. You're speaking, may I say, very rapidly. I apologize, Your Honor. We know the date. You don't have to say a couple. The 14th, he is told his job is over. That's right. You can leave or you can apply for something else. Now what's ambiguous about that? I don't believe that anything is ambiguous about that, Your Honor. The question was whether or not Mr. Blumaum was also entitled to stay on as a sales representative on the sales floor. And at trial, Godaddy's theory of the case was that he was entitled, that he was offered several times, and he didn't take those opportunities, and he eventually just never even came back. He was never even terminated was their point at trial. You mean that having been fired as sales manager, and being told that your alternatives are to leave or to apply for some other slightly higher job, he had a third alternative just to become one of the sales force, is that right? That's right, Godaddy admitted that that was the case. That was their own testimony by their own management folks at trial. And that he didn't have to apply for that. He simply could have said, I'll go on to the sales floor. That's their testimony. Correct. In fact, they're- Wasn't that just unacceptable to him? No, absolutely not. He testified to the exact contrary, that he wasn't happy about having to go back. He applied for it? He didn't have to apply for it, Your Honor. He was never even approached by Godaddy. He had no point. He loses the old position. He doesn't succeed with the new. Why does he say, well, I'm still staying here, I'm a salesman? He was in touch, he testified that he, according to you, he has a right to stay on. Does he exercise it? He didn't know that he had a right to stay on. They never told him that he had a right to stay on. But they admitted that he had a right to stay on. According to your story. Yes, sir. He has a right. It goes with his position. He can stay on. That's the company policy. That's correct. Well, why doesn't he say, here I am? He was not apprised of that right. He wasn't told that he had that right. All he was told, and this is his testimony, was, this was only mentioned to him at the last day of his employment, when he was told that he was not going to get the sales supervisor job, and he was not going to go back to the sales floor. And did you establish that this was a regular policy, that if people lose their higher-ranking job, they demote them and stay on the sales floor? Well, we didn't establish it as a regular policy, Your Honor. Is that anywhere in the record? It is, absolutely. Mr. Villeneuve's testimony is cited in our brief. Who's testimony? Mr. Villeneuve, who is the manager at GoDaddy, who immediately preceded Mr. Franklin, testified that the plan for all employees, and I can read it to you from the transcript if you'd like, Your Honor. I'd be happy to. In fact, let me, please. Mr. Villeneuve's testimony was. And his position was what? This was for the persons whose, Mr. Beaumont was included, the management staff who had their position eliminated as part of Franklin's reorganization. The person who testified? This is the person who was the head of the call center before Mr. Franklin arrived. At that point, I believe he was second in charge in the call center. Still a high management official at GoDaddy. His testimony is, question, for the unsuccessful candidates, what options were they given? Answer, they had two options. If you didn't get the position, you could go back to the phones. Going down a little bit further, if you chose not to go back to the phones, you could leave the company, and we had a severance package for everyone. GoDaddy's closing argument, every person who was not selected had exactly the same choice. They could either accept the sales representative position, or they could accept a severance package. Every single one of them, including Mr. Beaumont, was given the exact same choice. Mr. Beaumont testified that on the 17th of April, he's told, you don't get the sales supervisor job, you don't get the sales representative job, you're terminated immediately. So that's the evidence in the record supporting that you aren't. To come back to your question regarding what were the operative facts behind his protected activity, he's told at this meeting with Slezak and Villeneuve and Franklin that he will, his position's being eliminated, and there were two options for him. He is also, the only thing that Franklin says at that meeting is that he doesn't care about Mr. Beaumont's background or his history with the company. The next day, Mr. Beaumont comes by his cubicle, and Mr. Beaumont, or excuse me, Mr. Franklin comes by Mr. Beaumont's cubicle, notices some pictures up in his office, he asks where they're from, he says Morocco. Franklin asks, are you Moroccan? Yes. Are you Muslim? Yes. You're lucky I like you, and walks away. The next day, or I believe it may have been the same day, later that day, Mr. Beaumont reports to Ms. Slezak and says, in pertinent parts, and this is again directly from Mr. Beaumont's testimony, this guy here, Franklin, I don't know him, and two days ago he came in telling me that he doesn't care about my history and he wanted to eliminate my position. The next day he's taking interest for who I am and where I'm from, so I wanted her to look into it. This is important because it not only goes to confirming that he did, presenting evidence that he did complain to Ms. Slezak, but what it is that he complained of, and that's why there isn't a breeding issue in this case, Your Honor. Mr. Beaumont clearly presented, as I just read to you, a complaint that his position had been eliminated by Mr. Franklin, and the next day, Mr. Franklin stopped by and began to question him about his national origin and religion. The standard, as Your Honor referenced when speaking with Godey's counsel for whether or not actual conduct has taken place, is whether or not the person has a reasonable belief that what's happened to them may have constituted unlawful discrimination. And under these circumstances, it's more than adequate for a jury to infer that Mr. Beaumont believed that he was told his position was eliminated, and it may have been for reasons based on his national origin and or religion. Mr. Franklin made a negative comment about his religion and national origin in saying, you're lucky I like you, and he had previously told him that he didn't care about his background or history with the company. This should be more than sufficient to satisfy our burden on the protected activity element of our claim. Turning to the waiver issue, if I could quickly, Your Honors, the important point really there is what standard of review it is that we're applying to this case. I think the district court got this right and followed this court's precedent in Freund and earlier cases that you have to have, and you must raise in your Rule 58 motion, a clear, specific argument to preserve that argument for... Well, the argument there is she didn't communicate this, and she couldn't have communicated it because it hadn't happened. That's right. And excuse me, let me, let me, before I get... What's wrong with that? Well, the argument, we don't, and we don't, Your Honor, excuse me, we don't contest that the argument regarding knowledge, the knowledge component, was properly preserved for review post-verdict, as the district court found. I think they're absolutely correct. That complaint was, again, this is reading from, this is the trial transcript, the entirety of the Rule 58 argument that Godetti made at trial. With regard to the commission's retaliation claim, there hasn't been any evidence that Ms. Slazak told any of their panel members regarding the alleged reports made to her by Mr. Bumama. Mr. Franklin and Mr. Villeneuve both testified that, in fact, Ms. Slazak had not reported any activity to them, excuse me, any protected activity to them. And without this knowledge, knowledge by one of three panel members is insufficient for the jury to return a verdict on retaliation. We agree that that's sufficient to cover knowledge. Let me ask you something. If you choose your words carefully, you don't have to use so many of them, and you don't have to talk so fast. I'm sorry. The point being, Godetti made clear at trial that the only issue that it was challenging in this 50A motion was the knowledge component. There was no mention of a challenge to the evidence regarding protected activity. There's no challenge to the evidence regarding causation. The district court was proper, or was correct to determine those, deem those as a waive, and there's no evidence, or excuse me, the evidence is more than sufficient to support the commission's claim on both of those points. That's covered in our brief at more detail. If there are any specific questions about the facts regarding those two, I'd be happy to answer them slowly. Well, you talk so fast, you finished five minutes early. Let me, if I could, then, that's the strategy for an appellee, isn't it? I don't have. Your Honor, I'd be happy to sit down. I just want to make sure that I'm, okay, again, if there aren't any further questions. Thank you. Thank you, Your Honor. Rebuttal? Your Honor, I believe I have about three minutes, I hope. Well, you heard the evidence that he was fined on the 17th because he didn't get the, well, everybody else got a chance to go back to the sales force. But the EEOC's brief and the facts are that that decision was made on April the 4th. See, the- On April the 4th, he was told he was through with sales manager and that he could just get out. But suppose the policy was, as they represent, that anybody could go back to the sales force. Your Honor, if that was the policy, then that discrimination against him was made on April the 4th. If the policy was that everybody could go back to the sales reposition and he wasn't permitted, that decision was communicated to him on April the 4th according to his testimony. So this isn't a question of who's right. We're not arguing who's right and who's wrong and who should the jury have believed. We're saying that whether the jury believed the defendant or whether the jury believed the plaintiff, all the facts put the operative decision whether he could stay or go on the sales supervisor job on April the 4th. The company said he could- That's on the sales supervisor job. No, for the sales rep job. Remember, they both agreed that on April the 4th he was said, the inbound sales job is gone. They both agree on that. He was told you can apply for the sales supervisor position. They both agree on that. Where the parties disagree is that GoDaddy said he could go back to sales if he didn't get the job, and Mr. Buamama said he had to walk away. So our essential point is the testimony from both sides of the courtroom was the same. April 4th, a decision was made about whether he could return to the sales representative job, and it was communicated to him right then, and that was before any protected activity. So if there was any discrimination- But that was communicated to him right then in the way with the meaning attached by him that you say he had his head. Why does he keep coming to the office? At that point he was supposed to walk away if that's what he really thought was going on. Because he didn't get the sales supervisor job until April- was told he didn't get it until April 14th, if I'm correct. He could apply for the other jobs. See, he didn't know that he didn't get the other job until April the 14th, and therefore his employment ended a few days after that. So my point is we have a very unusual circumstance where the defendant is saying that the light was green, the plaintiff is saying that the light was red, and the jury says there was no stoplight, there was no light at that corner. They have no basis to say that there was a decision made after April the 7th, because both sides are saying the decision was made and communicated on April the 4th.  And we realize we're asking the courts to overturn a verdict and you don't do it lightly, but we think it's the unusual circumstance where the decision was made but not implemented until after the activity in the jury- And I assume this argument was made not only to the jury but made to the district judge? I don't- it would not have been made to the jury because Godaddy was arguing that they always told him he could stay. Godaddy was arguing the facts in front of the jury. So the point is that this argument was made to the judge because the judge understood that causation was an issue in the Rule 50A motion, but he held it- What about, though, you remember Mr. Tucker's recitation of the entire 50A motion? And there was not a word in there about causation. Well, but the district court understood it to be a causation. So if the district court understands it, you don't have to make a motion? No, you have to make the motion, but the court- the rulings on- the court decisions on 50A make clear that if the parties understand what the dispute is about, it honors form over substance to say that it wasn't named specifically that way. And there are a number of opinions, not only in this circuit but in other circuits, saying the purpose of Rule 50A is to put the other side on notice. All the parties knew about it. They can hardly say that they didn't know causation was an issue here. You know, the district judge's view of the evidence is so different from yours. I'm now reading in this footnote one in the district court's order. First off, he says you didn't make the argument in Rule 50A. And then he says, even if we were to take a liberal view, which he's indicating he won't, but this is a sort of, even if I were to reach the argument which I view as foreclosed, your arguments are not well taken. Defendant- this is, I'm now just reading from the district court. Defendant presented no evidence that the decision to terminate Mr. Bumama was made before he engaged in protective activity. Was he in the same courtroom with you? No, Your Honor, he was. But my point is that saying what the defendant offered as proof is not the issue we're raising here. The issue we're raising here is did anybody testify that a decision was made after April the 4th? And whether the jury didn't believe Godaddy saying that they said he could stay or whether they believed Mr. Bumama saying he had to go, the fact is the communication was on April the 4th. Okay. Thank you. Thank you, Your Honor. Thank both sides for their argument. The case of EEOC v. Godaddy Software is now submitted for decision.
judges: Noonan, Tashima, Fletcher